# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Case No. 3:13-cr-153-1 |
| v. | ) Judge Aleta A. Trauger |
| | ) |
| DORIAN AYACHE, | ) |

## MEMORANDUM

The defendant has filed a Motion to Dismiss Counts One through Nine (Docket No. 26), to which the government filed a Response in opposition (Docket No. 28), and the defendant filed a Reply (Docket No. 29). For the reasons stated herein, the Motion to Dismiss will granted.

## BACKGROUND

### I. Relevant Assumed Facts[1]

Defendant Dorian Ayache owned and operated a business called "Three Angels Farms," which transported horses from auctions to a location in Texas. In January 2012 and again in June 2012, Three Angels Farms vehicles were involved in serious traffic accidents that killed some of the horses being transported.[2] The Federal Motor Carrier Safety Administration ("FMCSA"), a

---

[1] For purposes of the Motion to Dismiss only, Ayache concedes that the court may assume the veracity of factual allegations in the Indictment and statements in evidentiary records filed by the parties. Ayache specifically reserves the right to contest these facts for all other purposes. Accordingly, nothing in this opinion should be construed as a "finding of fact" on the merits. Herein, the court discusses only the assumed facts pertinent to Ayache's contention that, even assuming all of the alleged facts to be true, certain counts against him do not articulate misdemeanor crimes.

[2] In the first incident, a driver fell asleep behind the wheel. In the second incident, the horse trailer collapsed and split in half. In connection with both incidents, the Tennessee Department of Safety identified multiple violations of federal law, including improper vehicle maintenance, operating without a commercial driver's license, and/or inadequate record-keeping.

1

subagency of the United States Department of Transportation ("DOT"), inspected Three Angels Farms following both incidents. On June 18, 2012, shortly after the second incident, an FMCSA inspector declared three of Three Angels Farms' four trucks out of service due to assorted discrepancies. On June 22, 2012, an FMCSA inspector determined that Ayache had remedied the three vehicle-related "out-of-service" violations.

On June 28, 2012, the FMCSA issued an Imminent Hazard Operations Out of Service Order ("First Imminent Hazard Order" or "First IHO") to Ayache and Three Angels Farms. (*See* Docket No. 26, Ex. A, First Imminent Hazard Order.) The First IHO stated that the FMCSA had "uncovered widespread regulatory violations that demonstrate a continuing and flagrant disregard for compliance" with applicable federal regulations. Among other things, the order stated that Three Angels Farms (1) had failed to maintain vehicle inspection, repair, and maintenance records, leading to an "alarmingly" poor vehicle inspection rating, (2) had a "disturbingly" negative fatigued driving score relative to its drivers, (3) had failed to follow controlled substance testing requirements for its drivers, and (4) had failed to follow driver qualification requirements. Pending compliance with multiple safety and licensing directives, the First IHO ordered Ayache and Three Angels Farms to cease all commercial operations, prohibited the operation of four specific vehicles, and forbade Ayache from engaging in "any sale, lease, or other transfer of equipment" without the written approval of a regional administrator. Essentially, the First IHO completely shut down Three Angels Farms and precluded Ayache from operating or disposing of the referenced commercial motor vehicles without express DOT authorization.[3]

---

[3]Notably, Section VI of the First IHO informed Ayache that "[f]ailure to comply with the provisions of this [Imminent Hazard] Order may subject Three Angels Farms to an action by the United States Attorney . . . for equitable relief and punitive damages" – *i.e.*, civil penalties. That

2

According to the Indictment (Docket No. 1), Ayache attempted to evade the restrictions set forth in the First IHO by selling his trucks to co-defendant Theresa Vincent, assisting Vincent in setting up a business that was essentially a "reincarnation" of Three Angels Farms under a different name ("Terri's Farms"), and by operating and/or causing to be operated the very trucks subject to the First IHO. The FMCSA discovered this conduct and issued an additional imminent hazard order ("Second Imminent Hazard Order" or "Second IHO"), which essentially extended the terms of the First Imminent Hazard Order to Terri's Farms and to the individuals (including Ayache and Vincent) allegedly associated with the new enterprise. (*See* Docket No. 26, Ex. C, Second Imminent Hazard Order.) The government alleges that, even after receiving the Second IHO, Ayache continued to flout the FMCSA's commands by selling one of the (effectively) impounded trucks to third parties on two more occasions.

## II.    The Motion to Dismiss

On September 9, 2011, the government filed a twelve-count Indictment against Ayache and Vincent. Counts One through Nine of the Indictment purport to charge Ayache with misdemeanor offenses under 49 U.S.C. § 521(b)(6)(A) for violating certain restrictions in the First and/or Second IHOs.[4] Counts Ten through Twelve charge Ayache with additional offenses

---

section also informed Ayache that, if Three Angels Farms continued to engage in "proscribed interstate or intrastate operations" after the effective date of the First IHO, it could result in additional "civil penalties" pursuant to 49 C.F.R. Pt. 386, App. A, § IV(g). (First IHO at p. 10.) Finally, this section added that, "[i]f violations are determined to be willful, criminal penalties may be imposed, including but not limited to a fine of up to $25,000 or imprisonment for a term not to exceed one year, or both. (49 U.S.C. § 521(b)(6)(A))." (First IHO at pp. 10-11.) Finally, Section VII of the IHO stated that "[p]enalty provisions for violations of Federal statutes and regulations are separate and distinct from this Order." (First IHO at p. 10.)

[4]Counts 1 through 4 charge Ayache with operating trucks or causing them to be operated in violation of the First and/or Second IHO prohibition on their operation; Counts 5 through 9 charge him with selling trucks in violation of the First and/or Second IHO prohibition on their

3

that Ayache's Motion to Dismiss does not challenge.[5]

Ayache argues that Counts One through Nine should be dismissed for the following reasons:

(1) Violating the terms of an IHO is not a misdemeanor offense;

(2) Even if violating an IHO constitutes a misdemeanor offense, the DOT overstepped its statutory authority by effectively impounding Ayache's vehicles and restricting his ability to sell them without following the procedures set forth in 49 U.S.C. § 521(b)(15)(C);

(3) Even if the DOT could have issued a "no sale" order, the First IHO exceeded the DOT's statutory and regulatory authorization to impose restrictions no broader than those "required to abate the hazard" under 49 U.S.C. § 521(b)(5) and 49 C.F.R. § 386.72(b)(2). As to this last argument, Ayache requests an evidentiary hearing.

For the reasons stated herein, the court agrees with Ayache that, as a matter of law, violating an IHO is not a misdemeanor offense. Therefore, the court will only address Ayache's first argument, the court expresses no opinion concerning Ayache's two alternative arguments, and no evidentiary hearing with respect to the "abatement" issue is necessary.

## **MOTION TO DISMISS STANDARD**

Motions to dismiss are governed by Rule 12 of the Federal Rules of Criminal Procedure, which permits pretrial consideration of any defense "the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(2). This includes a motion alleging a defect in the indictment for failure to state an offense. Fed. R. Civ. P. 12(b)(3)(B).

---

sale without DOT authorization.

[5]Count 10 charges Ayache with conspiracy to defraud the United States in violation of 18 U.S.C. § 371; Count 11 charges Ayache with attempting to destroy evidence intended for use in the grand jury proceeding against him (namely, emails within his Yahoo! account), in violation of 18 U.S.C. § 1512(c)(1); and Count 12 charges Ayache with attempting to conceal his emails from use in the grand jury proceeding against him, in violation of 18 U.S.C. § 1512(c)(1).

4

# ANALYSIS

I. **Whether Violating an IHO Constitutes a Misdemeanor Offense Under 49 U.S.C. § 521(b)(6)(A).**

   A. **Introduction**

Here, the parties do not dispute any factual issues. Instead, they raise a purely legal question: does violating an IHO constitute a misdemeanor crime under 49 U.S.C. § 521(b)(6)(A)? This appears to be a question of first impression in the federal courts.

As an initial matter, "[o]ne may be subjected to punishment for crime in the federal courts only for the commission or omission of any act defined by a statute, or by regulation having legislative authority, and then only if punishment is authorized by Congress." *Viereck v. United States*, 318 U.S. 236, 241 (1943). "Where the charge is of crime [sic], it must have clear legislative basis." *United States v. George*, 228 U.S. 14, 22 (1913).

Here, in order to determine whether Congress made the violation of a § 521(b)(5) IHO a misdemeanor offense, the court must undertake a careful analysis of the interlocking statutes and regulations relating to commercial motor vehicle safety standards, licensing standards, and IHOs.

   B. **Statutory Framework for Commercial Motor Vehicle Safety Standards, Licensing Standards, and IHOs.**

      1. <u>Commercial Motor Vehicle Safety and Licensing Standards</u>

         a. Laws and Regulations Relating to Commercial Vehicle Safety

Subtitle VI of Title 49 relates to "Motor Vehicle and Driver Programs." Chapter 311 of Part B of that subtitle contains laws relating to "Commercial Motor Vehicle Safety." Subchapter III of Chapter 311 (*i.e.*, Subchapter III of the laws concerning Commercial Motor Vehicle Safety)

5

contains laws relating to the "Safety Regulation" of commercial motor vehicles.[6] Sections 31131 through 31151 comprise Subchapter III.[7] The court will hereinafter refer to Subchapter III (excepting §§ 31138 and 31139) and 49 U.S.C. § 31502 collectively as "Safety Laws."

In 49 U.S.C. § 31136(a) – a provision within Subchapter III of Chapter 311 – Congress authorized the Secretary of Transportation (the "Secretary") to "prescribe regulations on commercial motor vehicle safety" relating to "minimum safety standards for commercial motor vehicles," including regulations ensuring that "commercial motor vehicles are maintained, equipped, loaded, and operated safely" and that "the responsibilities imposed on operators of commercial motor vehicles do not impair their ability to operate the vehicles safely." *See* 49 U.S.C. § 31136(a)(1)-(2). The court will refer to these regulations as "Safety Regulations."

                b.        Laws and Regulations Relating to Licensing

In 49 U.S.C. §§ 31302 to 31305, Congress imposed requirements relating to the licensing and fitness of commercial motor vehicle drivers, including, *inter alia*, requiring drivers to possess a commercial driver's license, requiring drivers to notify their employer of any traffic violations,

---

[6]Sections 31138 and 31139 relate to minimum "financial responsibility" coverage for the transportation of passengers (§ 31138) or property (§ 31139) in certain types of commercial motor vehicles. Although §§ 31138 and 31139 fall within Subchapter III of Chapter 311, the relevant civil and criminal penalty provisions of 49 U.S.C. § 521(b) at issue here (as discussed herein) specifically *exclude* §§ 31138 and 31139 from their coverage. For purposes of simplicity within this opinion, the court will similarly exclude §§ 31138 and 31139 from its definitions of statutes and regulations relating to commercial motor vehicle "safety."

[7]Chapter 315 of Part B of Subtitle VI, codified at 49 U.S.C. §§ 31501-31504, contains additional laws relating to "Motor Carrier Safety." Section 31502 contains requirements relating to the qualifications, hours of service, and equipment standards for motor carriers, including authorization for the Secretary to impose regulations relating to those issues. *See* 49 U.S.C. § 31502(b). As discussed herein, the relevant provisions of 49 U.S.C. § 521(b) at issue here address both Subchapter III (excepting §§ 31138 and 31139) and § 31502 together as laws relating to motor vehicle "safety." Section 31502 otherwise has no bearing on the legal questions presented here.

and imposing record-keeping requirements on the drivers' employers. *See generally id.* at §§ 31303-04. The court will refer to these statutory provisions as the "Licensing Laws." In § 31305 of the Licensing Laws, Congress authorized the DOT to pass regulations implementing the Licensing Laws, including minimum standards for vehicle testing and fitness. The court will refer to these regulations as "Licensing Regulations."[8]

In sum, Congress enacted Safety and Licensing Laws and gave the DOT authority to promulgate Safety and Licensing Regulations to implement them.

> 2. Statutory Provisions (Within 49 U.S.C. § 521(b)) Relating to Violations of Motor Vehicle Safety and Licensing Regulations

As set forth in 49 U.S.C. § 521, people who violate commercial motor vehicle Safety Regulations and/or Licensing Regulations can face both civil and criminal penalties. As the court construes § 521, the penalties are as follows:

- Civil Penalties: (1) Under § 521(b)(2)(A), someone who violates a Safety Regulation faces civil monetary penalties up to $10,000 per violation;[9] and, (2) under § 521(b)(2)(C), someone who violates a Licensing

---

[8]Title 49 U.S.C. § 31310 articulates "disqualifications" for commercial motor vehicle drivers (*e.g.*, driving while intoxicated). Subpart (g)(1)(A) of § 31310 directs the Secretary to issue regulations providing for the disqualification of a commercial driver who commits "a serious offense involving a motor vehicle (other than a commercial motor vehicle) that resulted in the revocation, cancellation, or suspension of the individual's license." In the relevant penalty provisions within 49 U.S.C. § 521(b) discussed herein, the licensing-related provisions impose penalties for violating both the Licensing Regulations and/or regulations issued pursuant to § 31310(g)(1)(A). For purposes of simplicity only, the court's definition of "Licensing Regulations" includes § 31310(g)(1)(A).

[9]Section 521(b)(2)(A) reads as follows: "[A]ny person who is determined by the Secretary, after notice and opportunity for a hearing, to have committed an act that is a violation of regulations issued by the Secretary under subchapter III of chapter 311 (except sections 31138 and 31139) or section 31502 of this title [*i.e.*, the Safety Regulations] shall be liable to the United States for a civil penalty in an amount not to exceed $10,000 for each offense."

7

Regulation faces civil penalties up to $2,500 per violation.[10]

- <u>Criminal Penalties</u>: (1) Under § 521(b)(6)(A), someone who knowingly and willfully violates a Safety Regulation faces a fine of up to $25,000 and/or imprisonment for one year – a Class A misdemeanor;[11] and (2) under § 521(b)(6)(B), someone who knowingly and willfully violates a Licensing Regulation faces a maximum fine of $5,000 and/or a maximum of 90 days of imprisonment – a Class B misdemeanor.[12]

In sum, an individual who violates a Safety Regulation (*i.e.*, a regulation issued under a Safety Law) or a Licensing Regulation (*i.e.*, a regulation issued a Licensing Law) faces *both* civil and criminal misdemeanor penalties.

        3.      <u>Statutory Provisions (Within 49 U.S.C. § 521(b)) Relating to Violations of Imminent Hazard Orders</u>

Section 521 also includes a third type of remedy available to the Secretary: under § 521(b)(5), if the Secretary finds that a violation (or combination of violations) of the Safety and Licensing Laws or Regulations imposes an "imminent hazard to safety," the Secretary "shall order a vehicle or employee operating such vehicle out of service, or order an employer to cease

---

[10]Section 521(b)(2)(C) reads as follows: "Any person who is determined by the Secretary, after notice and opportunity for a hearing, to have committed an act which is a violation of section 31302, 31303, 31304, 31305(b) or 31310(g)(1)(A) [*i.e.*, the Licensing Laws] shall be liable to the United States for a civil penalty not to exceed $2,500 for each offense."

[11]Section 521(b)(2)(A) reads as follows: "Any person who knowingly and willfully violates any provision of subchapter III of chapter 311 (except sections 31138 and 31139) or section 31502 of this title [*i.e.*, the Safety Laws], or a regulation issued under any of those provisions [*i.e.*, the Safety Regulations] shall, upon conviction, be subject for each offense to a fine not exceed $25,000 or imprisonment for a term not to exceed one year . . . ." (emphasis added).

[12]In relevant part, Section 521(b)(6)(B) reads as follows: "Any person who knowingly and willfully violates – (i) any provision of section 31302, 31303(b) or (c), 31304, 31305(b), or 31310(g)(1)(A) of this title [*i.e.*, the Licensing Laws] or a regulation issued under such section [*i.e.*, the Licensing Regulations], . . . shall, upon conviction, be subject for each offense to a fine not to exceed $5,000 or imprisonment for a term not to exceed 90 days."

all or part of the employer's commercial motor vehicle operations." *See id.* at § 521(b)(5)(A).[13]
When the Secretary issues an "imminent hazard" order under § 521(b)(5), the Secretary may not impose a "restriction . . . beyond that required to abate the hazard." *Id.* at § 521(b)(5)(A). The court will refer to an IHO issued under 49 U.S.C. § 521(b)(5) as a "§ 521(b)(5) IHO." Furthermore, an individual subject to a § 521(b)(5) IHO has the right to expedited administrative review of the order within 10 days. *See id.* § 521(b)(5)(A) (incorporating the administrative review procedures set forth in 5 U.S.C. § 554).

Section 521(b)(2)(F), entitled "Penalty for violations relating to out of service orders," provides that anyone who violates "an imminent hazard out of service order issued under subsection (b)(5) of this section" is liable for a civil penalty of up to $25,000. Although Section 521 contains this civil penalty provision for violation a § 521(b)(5) IHO, § 521 does not contain a corresponding criminal misdemeanor penalty provision. That is, although Congress imposed stiff civil penalties (set forth in § 521(b)(5)(F)) for someone who violates a § 521(b)(5) IHO, Congress did not include a provision making it a misdemeanor crime to violate this type of an IHO.

Finally, 49 U.S.C. § 526 – entitled "General criminal penalty when specific penalty not provided" – states that, "[w]hen another criminal penalty is not provided under a provision of this chapter, . . . a person that knowingly and willfully violates any of those provisions or a regulation or *order* of the Secretary of Transportation under any of those provisions, . . . shall be fined at least $100 but more than $500 for the first violation and at least $200 but not more than

---

[13]Section § 521(b)(5)(B) defines "imminent hazard" to mean "any condition of a vehicle, employee, or commercial motor vehicle operations which substantially increases the likelihood of serious injury or death if not discontinued immediately."

$500 for a subsequent violation. A separate violation occurs each day the violation continues." 49 U.S.C. § 526 (emphasis added). As Ayache points out, there is a colorable argument that § 526 makes it a "petty offense" to violate a § 521(b)(5) IHO, which may constitute an "order" issued by the Secretary for purposes of § 526. Here, the government has charged Ayache only with Class A misdemeanors under § 521(b)(6)(A) for violating the First and Second IHOs, not with petty offenses under § 526. Therefore, the court need not make any findings about the applicability of § 526 to Ayache.

4. <u>Harmonized Construction of the Penalties Set Forth in § 521(b).</u>

In determining statutory meaning, the court starts, "as always, with the language of the statute." *Dean v. United States*, 556 U.S. 568, 572 (2009). The court must "ordinarily resist reading words or elements into the statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997). Furthermore, under the doctrine of *expressio unius est exclusio alterius*, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean*, 556 U.S. at 573 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)). Finally, the court "must read statutes to give effect to each [statute] if it can do so while preserving their sense and purpose." *Watt v. Alaska*, 451 U.S. 259, 267 (1981).

Here, the canons of statutory instruction compel a finding that § 521(b) does *not* on its face make violating a § 521(b)(5) IHO a misdemeanor offense. As described in the preceding analysis, § 521 contains provisions specific to Safety Regulations, Licensing Regulations, and IHO, establishing the following penalty structure:

- Safety Regulation violation: civil penalties (under § 521(b)(2)(A)) *and* criminal misdemeanor penalties (under 521(b)(6)(A)).

10

- Licensing Regulation Violation: civil penalties (under §§ 521(b)(2)(C)) *and* criminal misdemeanor penalties (under § 521(b)(6)(B)); and

- Violation of a § 521(b)(5) IHO: *Only* civil penalties under § 521(b)(2)(F)).

Given that the statute contains specific provisions authorizing both civil and criminal penalties for Safety Regulations and Licensing Regulations, but contains a separate specific provision authorizing *only* civil penalties for violating an IHO, the court must conclude that Congress intentionally and purposely declined to include an associated criminal misdemeanor provision for violating a § 521(b)(5) IHO. Indeed, the inclusion of the catch-all petty offense provision in § 526 demonstrates that Congress recognized that the violation of certain "orders" of the Secretary were not otherwise punishable as a criminal offense.

In sum, under a straightforward reading of the statute, 49 U.S.C. § 521 affords the Secretary the following remedies against individuals who violate Safety and/or Licensing Regulations: (1) to provide immediate protection to the public, the Secretary can issue a narrowly tailored IHO to restrain the violator from causing an imminent danger, which order is subject to expedited administrative review; (2) the Secretary can pursue civil penalties for violations of the Safety and/or Licensing Regulations; and/or (3) the Secretary can enlist the Attorney General to bring criminal proceedings against individuals who knowingly and willfully violated the Safety and/or Licensing Regulations.

As Ayache persuasively argues, from a policy perspective, there are valid reasons why Congress may have chosen not to make violating a § 521(b)(5) IHO a misdemeanor criminal offense. Before becoming law, the Safety and Licensing Laws and Regulations were subject to legislative or quasi-legislative processes (*i.e.*, formal rulemaking after the requisite notice and

11

comment period). By contrast, § 521(b)(5) IHOs reflect a short-term *ad hoc* decree by an administrator, without the checks imposed by the public procedural safeguards of a legislative or quasi-legislative process.

Moreover, Congress's authorization to the DOT to issue § 521(b)(5) IHOs was not without teeth: Congress authorized the Secretary to pursue stiff civil penalties (up to $25,000 per violation) against individuals who violate a § 521(b)(5) IHO. Furthermore, through the catch-all provision in § 526, Congress also may have authorized criminal fines (but not imprisonment) for individuals who violate § 521(b)(5) IHOs. Thus, even if violating an IHO does not constitute a misdemeanor, the Secretary can punish offenders and deter others through the civil remedies set forth in § 521(b)(2)(F) and, perhaps, through the assessment of additional fines in a criminal proceeding.

### III. The Government's Position: The DOT Created a Misdemeanor Offense for Violating an IHO.

The government argues that, notwithstanding a straightforward construction of 49 U.S.C. § 521, Ayache nevertheless committed a Class A misdemeanor offense under § 521(b)(6)(A) when he violated the First and Second IHOs. In 49 C.F.R. § 386.72, the DOT essentially duplicated the IHO provisions set forth by Congress in 49 U.S.C. § 521(b)(5). The government argues that this particular regulation was promulgated "under" a Safety Law – *i.e.*, that it is a *Safety Regulation*, the violation of which constitutes a misdemeanor offense under § 521(b)(6)(A). In response, Ayache argues that, regardless of how the DOT may have characterized the basis for IHO provisions relating to commercial motor vehicles set forth in 49 U.S.C. § 386.72, the relevant portion of the regulation is *not* a "Safety Regulation" subject to the criminal penalty provisions in § 521(b)(6). Instead, contends Ayache, the *actual* basis for the

12

relevant provisions of the regulation is § 521(b)*(5) – i.e.*, the subpart of § 521(b) that specifically relates to IHOs. As explained herein, the court agrees with Ayache. *See United States v. Saade*, 652 F.2d 1126 (1st Cir. 1981) (determining that more specific statutory grant of regulatory authorization legally authorized the regulation at issue, rather than a more general grant of regulatory authority within the same subchapter of the federal code).

### A. Regulatory History of 49 C.F.R. § 386.72

The IHO provision in 49 U.S.C. § 521(b)(5) was enacted into law as Section 213(b) of the Motor Carrier Safety Act of 1984 ("MSCA"). In 1985, the DOT promulgated 49 C.F.R. § 386.72, which purported to "implement" 49 U.S.C. *§ 521(b)(5)*. *See* Fed. Reg. 40304-01, 1985 WL 129686, 40305 (Oct. 2, 1985). In essence, the DOT simply reiterated the statutory requirements for IHOs set forth in § 521(b)(5). At the time, the DOT did not purport to invoke Subchapter III of Chapter 311 as the basis for the regulation.

Effective August 2005, Congress passed the "Safe, Accountable, Flexible, Efficient Transportation Equity Act" ("SAFETEA"). Among other things, SAFETEA added new provisions to Subchapter III of Chapter 311 of Title 49 (*i.e.*, the Safety Laws), including § 31151 (§ 4118(a) of SAFETEA), which addressed the new phenomenon of "intermodal equipment providers." *See* Pub. L. 109-59, Title IV, § 4118(a). The new § 31151 required the Secretary to promulgate regulations "to ensure that intermodal equipment . . . is safe and systematically maintained," including, *inter alia*, a regulation setting forth "a prohibition on intermodal equipment providers from placing intermodal equipment in service on the public highways to the extent such providers or their equipment are found to pose an imminent hazard." 49 U.S.C. § 31151(a)(3)(I).

13

In 2008, *pursuant to the new statutory mandate in § 31151(a)(3)(I)*, the Secretary amended 49 C.F.R. § 386.72 to include explicit references to IHOs related to intermodal equipment providers. *See generally* 73 Fed. Reg. 76794-01 (Dec. 17, 2008). Thus, unlike the pre-existing regulatory provisions relating to § 521(b)(5) IHOs, the 2008 revisions to the regulation *were* made pursuant to a provision in Subchapter III, namely § 31151(a)(3)(I). Presumably for that reason, the DOT invoked Subchapter III as grounds for the regulatory revisions to 49 C.F.R. § 386.72 as they related to intermodal equipment providers.

B. **Impact of Regulatory History on the Court's Construction of 49 C.F.R. § 386.72**

Here, the government argues that the DOT's recent invocation of Subchapter III of Chapter 311 as a basis for 49 C.F.R. § 386.72 shows that the regulation as a whole is a "Safety Regulation" under Subchapter III of Chapter 311. However, as the court's previous analysis demonstrates, the relevant provisions of the current version of 49 C.F.R. § 386.72 (*i.e.*, provisions other than those specific to intermodal equipment providers) all drew, and continue to draw, their statutory authorization from *§ 521(b)(5)*, not the Safety Laws.

The current version of the regulation itself confirms the court's construction: multiple provisions of the regulation continue to refer back to § 521(b)(5) as the source of authority.[14] Furthermore, part (b)(6) of the regulation indicates that violators face the civil penalties set forth

---

[14]*See* 49 C.F.R. §§ 386.72(b)(1)(ii) (providing for issuance of "out-of-service" orders "as provided by 49 U.S.C. *§ 521(b)(5)*") (emphasis added) and 386.72(b)(4) (stating that the subject of an IHO shall "comply immediately," but providing for expedited administrative review "as provided by section 213(b) of the Motor Carrier Safety Act of 1984, *(49 U.S.C. § 521(b)(5))* (emphasis added).

in "Subpart G" (*i.e.*, 49 C.F.R. §§ 386.81 through 386.84),[15] which incorporates a schedule of civil fines specifically related to violations of "Out-of-Service Order[s]." *See* 49 C.F.R. Pt. 386, App A., Penalty Schedule; Violations of Notices and Orders, Part IV.[16]

Finally, the court observes that Section 31136 authorized the Secretary to promulgate "safety standards." From a practical perspective, a § 521(b)(5) IHO is not itself a "safety standard" – rather, it is a mechanism for enforcing such a standard.

In sum, for these reasons, the court does not construe the relevant IHO provisions in 49 C.F.R. § 386.72 as "Safety Regulations." Because those provisions are not Safety Regulations, they do not fall within the ambit of a violation of § 521(b)(6)(A).

### C. Additional Reasons Not to Construe 49 C.F.R. § 386.72 as a "Safety Regulation"

If the court were to construe the relevant portions of 49 C.F.R. § 386.72 as "Safety Regulations," it would create internal inconsistencies within § 521.

First, as discussed above, the statute itself indicates that Congress only authorized *civil*

---

[15]*See* 49 C.F.R. §§ 386.81 (stating that "[t]he amounts of *civil penalties* that can be assessed for regulatory violations subject to the proceedings in this subchapter are established in the statutes granting enforcement powers") (emphasis added) and 386.82(a)(4) (providing "[*a*]*dditional civil penalties* for violations of notices and orders which are issued under civil forfeiture proceedings pursuant to 49 U.S.C. § 521(b)," including notices and orders related to "out-of-service" orders under 49 C.F.R. § 386.72(b)(1) (emphasis added)).

[16]For example, consistent with the $25,000 per violation maximum authorized by Congress in § 521(b)(2)(F) [*i.e.*, the civil penalty provision specific to violations of § 521(b)(5) IHOs], Appendix A to Subpart G penalizes IHO violators as follows: (1) up to $2,100 per violation for operating a motor vehicle during the period during which the vehicle was placed out of service (App. A, Part IV.a), (2) up to $16,000 per violation against a motor carrier that permits a driver to operate a commercial vehicle during the period in which the driver was placed out of service (*id.*, Part IV.b); and (3) up to $16,000 per violation for permitting, before required repairs are made, the operation of a commercial motor vehicle placed out-of-service for repairs (*id.*, Part IV. d).

15

*penalties* for violations of a § 521(b)(5) IHO. Thus, a construction of the relevant portions of 49 C.F.R. § 386.72 as Safety Regulations would essentially require the court to read back into the statute a criminal penalty that Congress intentionally did not include. There is no reason for the court to construe the DOT as effectively creating a misdemeanor offense (via § 521(b)(6)(A)) that Congress, by omission, did not authorize.

Second, if the court were to construe the relevant portions of 49 C.F.R. § 386.72 as Safety Regulations, it would mean that a violation of § 386.72 would subject the violator to civil penalties under *both* § 521(b)(2)(A) (providing civil penalties for violating Safety Regulations) and § 521(b)(2)(F) (providing civil penalties for violating § 521(b)(5) IHOs). Those two civil penalty provisions are materially different: § 521(b)(2)(A) caps civil penalties for violating Safety Regulations at $10,000 per violation, whereas § 521(b)(2)(F) caps civil penalties for violating § 521(b)(5) IHOs at $25,000 per violation. Thus, to the extent that the DOT has promulgated a schedule of fines for violating § 521(b)(5) IHOs that includes fines *over $10,000* – which the DOT has (*see* Appendix A to 49 C.F.R. § 386, at Part IV) – those fines would violate § 521(b)(2)(A) under the position advanced by the government here. The court finds no reason to read such an inconsistency into § 521 in violation of traditional standards of statutory construction, which counsel the court to read provisions in harmony to the extent possible.

Coming back to the issue presented, Counts One through Nine charge Ayache with Class A misdemeanors under § 521(b)(6)(A) for violating the First and Second IHOs. However, for the reasons explained herein, Congress did not make violating a § 521(b)(5) IHO a misdemeanor offense. Accordingly, Counts One through Nine of the Indictment against Ayache must be dismissed.

## CONCLUSION

For the reasons stated herein, the Motion to Dismiss will granted and Counts One through Nine against Ayache will be dismissed.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge